# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs December 4, 2012

## STATE OF TENNESSEE v. MAHLON JOHNSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 09-06118     James C. Beasley, Jr., Judge**

**No. W2011-01786-CCA-R3-CD  - Filed February 7, 2013**

A Shelby County jury convicted the Defendant, Mahlon Johnson, of one count of aggravated assault and two counts of sexual battery, and the trial court sentenced him to an effective sentence of twenty-seven years in the Tennessee Department of Correction.  On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his convictions for sexual battery; (2) the trial court erred when it failed to merge the sexual battery convictions; (3) the Defendant's convictions for sexual battery and aggravated assault violate double jeopardy protections; and (4) the trial court improperly sentenced him.  The State agrees that there is insufficient evidence to support the Defendant's sexual battery convictions, and it asks us to reverse those convictions and dismiss the indictments.  After a thorough review of the record and applicable authorities, we conclude there exists in the record sufficient evidence to support the Defendant's convictions and that the trial court did not err when it did not merge those convictions.  We further conclude that the trial court did not err when it sentenced the Defendant.  We, therefore, affirm the Defendant's convictions and sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ALAN E. GLENN and JEFFREY S. BIVINS, JJ., joined.

R. Todd Mosley, Memphis, Tennessee (on appeal) and James Thomas and Mark Saripkin, Memphis, Tennessee (at trial) for the appellant, Mahlon Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pam Fleming, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Facts

This case arises out of an altercation that occurred on October 31, 2008, between the Defendant and his wife, the victim, from whom he was separated at the time of these events. A Shelby County grand jury indicted the Defendant for two counts of aggravated rape, aggravated assault, and aggravated burglary. At his trial on these charges, the parties presented the following evidence: Tonya Johnson, the victim, testified that she and the Defendant had been married but that, at the time of trial, they were divorced. She said that she and the Defendant separated in July 2007, and he moved out of the home ("796 Olympic").

The victim described how she came to be in possession of 796 Olympic, saying that her mother's neighbor willed the house to her and her sister when he died. When they first gained possession of the house, her sister moved into it. Some time "in the 2000s", the victim's sister vacated the house, and the victim moved into the home. Two weeks before October 31, 2008, the victim moved out of 796 Olympic and moved into her daughter's apartment.

The victim testified that after leaving work on October 31, 2008, she went to the home of a friend, "Cindy," to have a drink. She said she knew she stayed at the house until after midnight, because Cindy wished the victim, whose birthday was November 1, a happy birthday before the victim left Cindy's house. The victim said that she did not go to her daughter's house when she left; rather she went to 796 Olympic because it was closer for her, and she had a meeting at her church the following morning.

The victim said that, when she arrived at 796 Olympic, no one was there, and she took a shower and went to bed, ensuring she had locked the door before going to sleep. She was awakened during the night by an "unusual noise." She saw the Defendant, who did not have a key to the house, standing in her bedroom. The Defendant asked her where she had been and who she had been with while she was gone. He said that he had been calling her phone because he wanted to spend her birthday with her. The victim said she sat up in bed and tried to answer all his questions. The Defendant took off his jacket and his shirt, and, when the victim saw his "aggressive" facial expression, she became scared and got out of the bed.

The victim said that the Defendant continued asking her questions and then he grabbed her by her neck and pushed her into the hallway, pinning her against the wall. The Defendant "took off her shirt" and then "took his finger and rubbed it between [her] butt and he smelled it and said it smelled like [she had] been f***ing." He then took his finger, "rammed it in [her] vagina and said it was sticky." The Defendant then began choking the victim until the victim slid down onto the floor.

-2-

The victim recalled that the Defendant then began running through the house saying "the nigga must be still in the house." The victim said she remained on the floor because her "body was just numb" from the strangulation. The Defendant returned, snatched her legs apart, and rammed an object into her rectum. He then removed the object, put his hand into her vagina, and told her she had "nut coming out of [her]." The victim said the Defendant then began beating her in the back of the head. He snatched her up from the floor and said, "I'm going to kill this bitch" and "I want to knock out about three of her teeth out of her mouth." The victim said she was "screaming and screaming" for help.

The victim said the Defendant dragged her through the house, beating her while he dragged her. At some point, he grabbed a vase, and hit her with it. The Defendant then obtained a knife and started stabbing her. She said he stabbed her repeatedly, cutting patches of hair from her head. She grabbed the knife from his hand, and the Defendant bit her to keep control of the knife. At some point during the struggle, the knife broke. The Defendant took a screwdriver and began stabbing the victim in her ear and asked her, "who is the nigger that [you are] trying to save. Who [are] you f***ing?" The Defendant then said, "I'm going to burn this bitch up. I'm going to set this bitch on fire." The victim said she felt a liquid pouring on her, and, when she looked, she saw it was water from her iron. The Defendant then used the iron to beat her.

The victim said, throughout this incident, she repeatedly told the Defendant that she was not being intimate with anyone and that he was beating her for nothing. She said she screamed until she was hoarse and no sound would come out from her voice. The Defendant also hit her "across" the head with a large vase. The victim said that she was lying on the floor waiting "to die," while the Defendant sat on top of her saying "die, bitch. Die bitch."

The victim recalled that, while the Defendant was on top of her he told her that he saw her "getting f***ed in an empty heroin house." He said he saw her there getting out of a red car. The victim recalled that, at that point, everything "got calm." She asked the Defendant if she could lay in her bed to die, and the Defendant said "die, bitch. Bitch, I don't give a f**k about you. Die." The victim said she waited a few more minutes before asking the Defendant again if she could get into her bed to die. This time the Defendant allowed her to get into her bed.

The victim testified that, while she lay in her bed believing she was dying, the Defendant told her the financial problems he was having as a result of the actions of his girlfriend or ex-girlfriend. The victim said she asked the Defendant for a sip of water, and he said "bitch, we are going to die together." He then gave her a sip of Sprite from a bottle that was lying on the bed. She again asked the Defendant for water, and he got up and went toward the back of the house to get her water. The victim said that, when she heard the water

running, she jumped up and ran out the front door of her house. She said she was naked, and she ran screaming to the house of her neighbor, Doris Leaham Johnson ("Ms. Doris").[1] The victim recalled that, at first, the Defendant ran behind her, but then he returned to 796 Olympic.

The victim testified that Ms. Doris asked her what had happened and gave her clothes to put on. By that time, the police had arrived. The victim recalled that, at that point, she urinated and defecated on herself. The victim then began vomiting as well. The victim was transported by ambulance to the hospital.

At the hospital, doctors checked her rectum and told her that they needed to consult a surgeon. They gave her a blood transfusion because blood was running out of her rectum. A nurse from "MSARC" performed a sexual assault examination on the victim. The victim identified and described multiple pictures from the crime scene, which were then offered and admitted into evidence.[2]

During cross-examination, the victim testified that the Defendant was twelve years her junior. She conceded that the two first began dating when the Defendant was seventeen years old, and they were married in 1999, when the Defendant was twenty years old and she was thirty-one years old. The two were married for nine years before divorcing in 2009, almost a year after this incident. The victim conceded that between the time of their separation and divorce, the two engaged in intimate contact. She said, however, that they had not been together in that manner in September or October before this incident. The victim denied that a man ran out of the house shortly before the Defendant arrived.

About her injuries, the victim said that she did not receive any stitches for any of her wounds. The victim said that, before this incident, she had once suffered from a hemorrhoid.

Ms. Doris testified that, in October and November 2008, she lived at 798 Olympic Street, next door to 796 Olympic. Ms. Doris said that she and the victim had grown up living on the same street, and the victim went to school with Ms. Doris's brother. Ms. Doris said that she also knew the Defendant from "the neighborhood." She said that, while the Defendant was much younger than she, she had seen him grow up.

---

[1]Because this witness, who testified at trial, shares a last name with the victim and the Defendant, but is not related to them, we will refer to her by her first name.

[2]The pictures, which are marked exhibits 1-15, were not made a part of the appellate record. Exhibit 15 was marked for identification purposes only and was not admitted into evidence.

Ms. Doris recalled that November 1st was the birthday of both her daughter and the victim. For a couple of weeks before November 1, 2008, the victim had not been at 796 Olympic. Ms. Doris saw the Defendant "come and go" from the house during that time, but she was unsure whether he was staying there. She opined, however, that the Defendant had not lived at the house for a year before this incident.

Ms. Doris said that, on the morning of November 1, 2008, she was on her way to a church meeting when she heard someone crying. She went to her front door, and she saw the victim at the end of her stairs at her gate. The victim was nude, crying, and moving slowly. Ms. Doris helped the victim inside the house and gave her some clothing. Ms. Doris said she saw injuries on the victim, and the victim told Ms. Doris, "[H]e beat me, sister. He beat me."

Ms. Doris said the victim asked her for a feminine hygiene pad, saying that she felt like she was bleeding. The victim also told her that her stomach was hurting "bad." Ms. Doris said she got a towel for the victim because the victim had urinated and defecated on herself. The victim left Ms. Doris's house by ambulance.

During cross-examination, Ms. Doris testified that it was not unusual to see the Defendant coming and going from 796 Olympic. She said that he did so frequently. During redirect examination, Ms. Doris reiterated that the victim had not lived at the house for two weeks before this incident.

Officer Vincent Fason, a Memphis Police Department officer, testified that he responded to a call with regard to this incident. Upon arrival, he observed that the victim's eyes and facial area were swollen, and she had bruises on her arms. The officer stated that the victim was crying and described her demeanor as upset and angry. The victim told the officer that her assailant hit her with an iron, punched her repeatedly in the face, and cut her hair and back with a knife. Officer Fason observed a "long gash . . . almost down the full length of [the victim's] back" consistent with the victim's allegations.

Officer Fason explained that, after he responded to Ms. Doris's house, he went to the victim's house, where he observed damage to the handle of the front storm door and the door frame. Inside, he saw a vase and what appeared to be a knife handle.

During cross-examination, Officer Fason said he could not tell if the damage to the victim's front door was recent. He also said he did not see any blood on the handle of the knife he found inside the house. The officer also said that the victim was transported to the hospital in a "non-critical condition."

Judy Pinson testified that she was employed as a sexual assault nurse examiner with a sexual assault center, Memphis Sexual Assault Resource Center ("MSARC"), in Memphis, Tennessee. Her responsibilities included assessing and treating victims of sexual assault and collecting evidence. She was also responsible for keeping the records of other nurses performing similar examinations. As such, she obtained the report from the victim's examination, at the State's request. Pinson testified that a MSARC nurse performed the examination and evaluation of the victim at the emergency room of the hospital. Pinson read portions of the report, which indicated that the victim complained of a sexual assault and physical assault by her estranged husband.

The nurse said the report identified "numerous" injuries on the victim. The victim had multiple hematomas over her entire head. She suffered six puncture wounds to her neck, a bite mark to her head, hemorrhages in both eyes. The victim's eyelids were puffy and "bluish." The victim's left ear was swollen and draining clear fluid. There was a puncture wound to the inside of her bottom lip, which was purple in color. The victim's genital exam showed a swollen vulva and there was an "external hemorrhoid . . . with a laceration" that was oozing. Pinson identified some pictures of some of the victim's injuries.

During cross-examination, Pinson agreed that she did not perform the victim's examination; rather she was reading the report from the nurse who had performed the examination. She agreed that a hemorrhoid can be made to bleed in a situation not involving a sexual assault. Pinson testified that none of the puncture wounds required stitches. On redirect examination, the nurse testified that puncture wounds do not normally require stitches.

On behalf of the Defendant, Tarkashala Brown, the Defendant's fourteen-year-old daughter, testified that the victim was her step-mother. She said she lived most of her life with the victim and the Defendant at 796 Olympic. Brown said that, around the time of Halloween 2008, she was living with her mother but that she stayed on the weekends with the Defendant and the victim at 796 Olympic. Brown said her father had a key to the home, and he came and left as he pleased.

Brown recalled that, on Halloween night, the victim was supposed to pick her up at Brown's mother's house and take her to stay the night at 796 Olympic. The victim, however, never answered her telephone. Brown testified that the front door of 796 Olympic had always been broken and that it looked the same to her when she was at the house both before and after Halloween night. During cross-examination, Brown testified that the Defendant fathered her when he was eighteen years old. She said that her biological mother lived a few streets away from 796 Olympic, and she went back and forth between the two houses. She

agreed that she sometimes stayed at 796 Olympic with the victim when the Defendant was not present.

The Defendant testified and discussed his prior convictions. In 1999, he had been convicted of solicitation of bribery of a public servant, and in 2000 he was convicted of possession of a controlled substance. In 2004, he was convicted of possession of a controlled substance with the intent to sell or deliver, and in 2007 he was convicted of criminal attempt to possess.

The Defendant then discussed the events leading up to the charges in this case. He said that, in the weeks and months before this incident, he lived at 796 Olympic and had a key to the door. He recalled that the front door had been broken since he first moved into the home in 1999. He said that, in 2007, he and the victim separated but that he still visited the house frequently because he was "doing business some houses down from the street."

The Defendant testified that, the week before Halloween, he went to Albuquerque, New Mexico. The victim, he said, knew where he had gone, and she expected him back on that Sunday, the day after her birthday. He arrived home from New Mexico early, and he went straight to the house. He tried to call the victim to tell her that he was coming home early to surprise her for her birthday.

The Defendant said that, when he got to 796 Olympic and opened the front door, he saw a man "peeking in the hallway." The man, who knew it was the Defendant, came out of the room. The Defendant said the man left, and the Defendant went into the bedroom, where he found the victim naked. The Defendant and the victim then got into an argument, during which the Defendant said he "end[ed] up smacking her." The Defendant did not deny hitting the victim repeatedly, saying that she also "hit [him] back."

The Defendant testified that the victim ran to the kitchen and got a knife. She came back and told him to leave before she "stuck him." The Defendant refused to leave and picked up a vase. He denied hitting the victim with the vase, but he told her that, if she "st[u]ck" him with the knife, he was going to "smash [her] across her head with th[e] vase." The Defendant said he approached the victim and "just started swinging on her . . . [and] [a]ll of the sudden she fell to the floor . . . [with] the knife in her hand." The Defendant confronted the victim about trying to "stick [him]" after he had caught her "violating, disrespecting with a man in my house." The Defendant said he was "constantly hitting [the victim]" until he got the knife out of her hand, at which time he said the fight ended.

The Defendant agreed that the victim was injured "pretty bad" but said that the assault was never sexual in nature. He said he never stuck his hand near her genital area or ever hit

her with an iron. He also denied removing her clothing. He said that he had, however, hit her with his fists and "scratched her for sure."

During cross-examination, the Defendant testified that he had been arrested for assault in July 2007 after he had an argument with the victim. He said that he had been convicted of assault. He denied that he was "ordered" to have no contact with the victim, saying that "they never told" him as much. He said that, as a result of his conviction, he stayed in a "penal farm" for forty-five days and then at a halfway house for forty-five days. The Defendant agreed that he fathered a child with a woman other than the victim while he was married to the victim.

The Defendant testified that when he said he did "business" at houses close by to 796 Olympic he meant that he sold drugs at those houses. He explained that, while he sold drugs, he did not sell drugs out of 796 Olympic. He said he would go to 796 Olympic in the morning and stay there during the day but then he would be gone from the house all night. He still, however, considered 796 Olympic his home. The Defendant agreed that the house was not in his name and that he had no legal ownership. He said, however, that he and the victim paid the victim's sister, who was "on drugs," $7,000 for the house because she could not pay the mortgage. The Defendant said the victim never moved out of the house, and he could not explain why she and Ms. Doris had so testified.

The Defendant discussed the man he alleged was at the home when he arrived. He said that, when he arrived back home from New Mexico the morning of this incident, he did not confront the naked man who was in his house because he had "to deal with her." The Defendant agreed that he was "smacking" the victim because she "disrespected" him by bringing another man into their home. The man, he said, was Allen Morris.

The Defendant again recounted his version of the series of events that occurred during the altercation. Notably, he maintained that the victim went to the kitchen to get the knife, contradicting the victim's testimony. He said he did not punch her in the face until she grabbed the knife. He agreed that, even when the victim had the chance, she never attempted to cut him with the knife. He, however, was so incensed at her grabbing the knife that he started "beating her in the head" with his fist, "hit[ting] her twice in the head." The victim fell to her knees and then onto her face, and the Defendant was "on her back." The Defendant then said he "hit her in the head about six, seven more times." During this process the knife broke, and he took the knife from her. The Defendant said that he did not know how the victim got the six puncture wounds in her neck. He said the wound that went the length of the victim's back looked "just like a whelp to [him]." He said it also may have been a scratch and that he may have scratched her but that there was "[n]o telling."

The Defendant looked at the other pictures entered into evidence and attempted to explain how the victim received the injuries depicted therein. He said that they reminded him that he had, in fact, bitten the victim during the struggle. The Defendant said that he just "threw" the knife once he got it from the victim. He could not explain why the knife blade was missing and only the handle was present at the house when police officers arrived.

When asked how the victim's hair was cut if the victim had the knife, the Defendant said he cut her hair in the hallway with some scissors. He said that the two "tussled" in the hallway while the victim had the knife and that, during this, he took some scissors and cut her hair. He had no explanation for why he cut her hair other than saying, "I just cut her hair."

The Defendant agreed that the victim ran out of the house naked while he went to get her water. He said he did not follow her because he did not know where she was going. He left 796 Olympic at that point, however, because he "kn[e]w" the victim was going to call the police, and he did not want to be at the house when police arrived. He agree that he was not arrested in relation to these acts until March, four months later. He conceded that he knew that he had been charged with aggravated assault. He became aware of this in November when police were searching his neighborhood on foot and by helicopter and questioning people about the Defendant's whereabouts. The Defendant said he "ran and hid until they left." He said he did not return to 796 Olympic after this incident; rather he stayed a few houses away. The Defendant purchased clothing daily rather than retrieve his clothing from 796 Olympic.

This concluded the proof presented by the parties. The State informed the court that to support the charge of aggravated rape, the State was relying on the entry into the vaginal cavity to support Count 1 of aggravated rape and entry into the anal cavity to support Count 2 of aggravated rape. The jury returned guilty verdicts of the lesser-included offense of sexual battery in both Counts 1 and 2. The jury also found the Defendant guilty of aggravated assault, Count 3. The jury found the Defendant not guilty of aggravated burglary, Count 4.

The trial court approved the verdicts and subsequently sentenced the Defendant to an effective sentence of twenty-seven years in the Tennessee Department of Correction. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his convictions for sexual battery; (2) the trial court erred when it failed to merge the sexual

battery convictions; (3) the Defendant's convictions for sexual battery and aggravated assault violate double jeopardy protections; and (4) the trial court improperly sentenced him.

## A. Sufficiency of Evidence

The Defendant contends the evidence is insufficient to sustain his convictions for sexual battery because there was no proof that his actions were committed for "sexual gratification," a required element of the offense. The State concedes the error, stating that although the evidence is sufficient to sustain a conviction for the indicted offense of aggravated rape, it is insufficient to support a conviction for the lesser-included offense of sexual battery.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State*

*v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In this case, the Defendant was charged with two counts of aggravated rape. The jury convicted him in each count of the lesser-included offense of sexual battery. Tennessee Code Annotated section 40-18-110(g)(4) (2012) states that sexual battery is a lesser included offense of aggravated rape. The Tennessee Supreme Court has recently held that when reviewing a sufficiency claim, this Court must review the evidence to support the crime for which the defendant was convicted and not the crime for which he was charged. *State v. Parker*, 350 S.W.3d 883, 907 (Tenn. 2011). To sustain a conviction of a lesser-included offense, the proof must be sufficient to support every element of the offense for which the Defendant was convicted. *Id.* at 909.

In this case the Defendant was convicted of sexual battery. "Sexual battery," as relevant to this case, is defined as, "(a) . . . unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: (1) Force or coercion is used to accomplish the act; . . . ." T.C.A. § 39-13-505(a)(1) (2010).

> "Sexual contact" includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can reasonably be construed as being for the purpose of sexual arousal or gratification.

T.C.A. § 39-13-501(6) (2010). "Intimate parts" includes the primary genital area, groin, inner thigh, buttock or breast of a human being. T.C.A. § 39-13-501(2) (2010).

The determination of the defendant's intent under the element of "sexual contact"is a question of fact. *State v. Anthony Lee Hill*, No. E2003-02998-CCA-R3-CD, 2005 WL 623244, at *5 (Tenn. Crim. App., at Knoxville, Mar 17, 2005) (stating "the question of whether the contact was for the purpose of sexual arousal or gratification on the part of the Appellant was a question for the jury to resolve"), *perm. app. denied* (Tenn. Oct. 10, 2005). Specifically, a jury m ay draw upon their common knowledge to infer that an accused forced intimate contact for the purpose of sexual arousal or gratification. *State v. Joseph Vermeal*, No. M2005-00568-CCA-R3-CD, 2005 WL 3543417, at *3 (Tenn. Crim. App., at Nashville, Dec. 28, 2005) (citing *State v. Meeks*, 876 S.W.2d 121, 131 (Tenn. Crim. App. 1993)), *perm. app. granted* (Tenn. June 5, 2006) (case dismissed by agreement of the parties). Further, the jury may infer intent from defendant's acts. *See State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004) (holding a jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to or concurrent with the killing) (citing *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999)); *State v. Brewer*, 945 S.W.2d 803, 808 (Tenn. Crim. App. 1997) (holding a jury could infer defendant's intent from his acts to support his conviction for coercion of a juror); *see also Montana v. Olson*, 951 P.2d 571, 578 (Mont. 1997) (holding the trier of fact could infer contact was "sexual contact" from the nature of the defendant's acts).

The phrase "for purposes of sexual arousal or gratification" simply defines the nature and purpose of the "sexual contact." The requirement of a particular purpose, to arouse or gratify sexual desire, distinguishes the crime of sexual battery from an ordinary assault and from non-criminal touching or contact. *See State v. Anthony Lee Hill*, No. E2003-02998-CCA-R3-CD, 2005 WL 623244, at *5 (Tenn. Crim. App., at Knoxville, Mar. 17, 2005) (citing MODEL PENAL CODE § 213.4 (1980)), *Tenn. R. App. P. 11 application denied* (Tenn. Oct. 10, 2005).

In *Montana v. Olson*, the Montana Supreme Court addressed a defendant's contention on appeal that the State failed to prove the element of "sexual contact" because it did not establish that he had touched the breasts of the victim, a child, for the purpose of arousing or gratifying his sexual desire. 951 P.2d at 577-78. He contended that he inadvertently touched the breasts when he "accidentally brushed" them. *Id*. 578. The court first stated "[i]ntent is a fact question for the jury, and it is well settled that the jury may infer intent from defendant's acts." *Id.* (citations omitted). The court went on to hold that there was sufficient evidence to support that the defendant touched the victim's breasts for his own sexual desire or gratification based upon the nature, and repeated occurrence, of the crime itself. *Id.* The Court stated:

[M]en usually do not go around rubbing the breasts or vaginal areas of small girls. Indeed, someone that would consistently rub the breasts or vaginal areas of small girls is obviously committing a sexual assault and is doing so for his own strange sexual desire.

*Id.* at 578.

Sexual arousal and gratification are amorphous terms and defy a narrow definition. Therefore, there is no bright line rule or test used to establish whether a defendant's sexual touching was motivated by a desire to arouse or gratify either party's sexual desire. "The very nature of determining whether or not certain acts were done to arouse or satisfy a sexual desire, or that they did, can be determined primarily from the acts themselves as distinguished from outright admissions." *North Dakota v. Jenkins*, 326 N.W.2d 67, 72 (N.D. 1982). While, in most cases, there is clear evidence that a defendant committing such a crime was aroused, a trier may find this element proven from less obvious evidence, considering the nature and circumstances surrounding the act itself. *See Ohio v. Mundy*, 650 N.E. 502, 510 (Ohio Ct. App. 1994); *see also Montana v. Olson*, 951 P.2d at 578 (stating "In addressing the issue of 'purpose' under the element of sexual contact, we have stated, 'intent is a fact question for the jury, and it is well settled that the jury may infer intent from the defendant's acts."); *North Carolina v. Connell*, 493 S.W.2d 292, 294 (N.C. Ct. App. 1997) (finding that a defendant's purpose in committing the act in indecent liberties cases is seldom proved by direct evidence and must ordinarily be proven by inference); *Jenkins*, 326 N.W.2d at 72 (finding that the very nature of determining whether or not certain acts were done to arouse or satisfy a sexual desire, or that they did, can be determined primarily from the acts themselves as distinguished from outright admissions).

After a thorough review of the record and applicable authorities, we cannot agree with the parties that the evidence does not support the jury's convictions for sexual battery. We rest our decision soundly in the deference given to the trier of fact to infer the Defendant's intent in committing the acts and the plain language of the statute. The statute defining "sexual contact" states that a touching meets the statutory definition if that touching "can reasonably be construed" as being for the purpose of sexual arousal or gratification. *See* T.C.A. § 39-13-501(6) (2010). Generally, when construing a statute, every word within the statute is presumed to "have meaning and purpose and should be given full effect." *State v. Odom*, 928 S.W.2d 18, 29-30 (Tenn. 1996) (quoting *Marsh v. Henderson*, 424 S.W.2d 193, 196 (Tenn. 1968)). This Court's primary duty in construing a statute is "to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995); *see also State v. Davis*, 940 S.W.2d 558, 561 (Tenn. 1997). Legislative intent should be gleaned from the "natural and ordinary meaning of the language used, without a forced or subtle

construction that would limit or extend the meaning of the language." *Carter v. State*, 952 S.W.2d 417, 419 (Tenn. 1997). Furthermore, this Court should construe a statute so that its component parts are consistent and reasonable, and inconsistent parts should be harmonized, where possible. *State v. Odom*, 928 S.W.2d at 30.

This Court has previously examined the statute defining "sexual contact" and concluded "there is no requirement that the sexual contact itself be for sexual arousal or gratification." *State v. Roy Chisenhall*, No. M20003-009560CCA-R3-CD, 2004 WL 12177118, at *3 (Tenn. Crim. App., at Nashville, June 3, 2004), *no Tenn. R. App. P. 11 application filed*. The Court went on to state that the statute also does not require that the appellant become sexually aroused or gratified by the sexual contact. The statute merely requires touching that can be "reasonably construed as being for the purpose of sexual arousal or gratification." *Id.* (citing T.C.A. § 39-13-501(6) (2010)); *State v. Steven Webster*, No. W1999-00293-CCA-R3-CD, 1999 WL 1097820, at *1-*2 (Tenn. Crim. App., at Jackson, Nov. 22, 1999), *perm. to app. denied* (Tenn. 2000)).

The question in this case is, then, whether the jury was within its broad discretion when it found that the evidence in this case proved that the Defendant's actions could be "reasonably construe[d]" to be for the purpose of sexual arousal or gratification. The crimes committed by the Defendant were, in this Court's opinion, very clearly sexual in nature. The Defendant returned home from a trip early to help the victim, to whom he was married but from whom he was separated, to celebrate her birthday. He said he found her with another man, a claim she denied at trial. In any event, by all accounts, the Defendant became enraged. He stripped her of her clothing and took his finger and "rubbed it between [her] butt and he smelled it and said it smelled like [she had] been f***ing." He then took his finger, "rammed it in [her] vagina and said it was sticky." The Defendant returned, snatched her legs apart, and rammed something into her rectum. He then took the object out, put his hand into her vagina, and told her she had "nut coming out of [her]." The Defendant repeatedly asked the victim, "Who [are] you f***ing?" The Defendant when he testified agreed he assaulted the victim because she "disrespected" him by bringing another man into their home. The victim was transported via ambulance to the hospital, where a sexual assault examination was conducted upon her, and the findings included that she had bruised and swollen labia and that she was bleeding from her rectum.

We do not accept the theory that the Legislature intended that a person who violates and abuses the most intimate physical areas of another person, inflicting pain and injuries, would fall outside the scope of sexual battery due to the "sexual contact" language contained in Tennessee Code Annotated section 39-13-501(6). An assault charge, which would be the resulting conviction if there was no "sexual contact" element, would not provide the necessary deterrent to such conduct or protect the dignity of the victims of such egregious

acts. Such a holding would be a miscarriage of justice, a usurpation of the jury's role as the trier of fact, and a misinterpretation of the conduct the Legislature intends to prohibit.

We conclude that a rational trier of fact could have found the essential elements of the sexual battery beyond a reasonable doubt, by finding that the Defendant in this case committed the assault for his sexual arousal or gratification. The Defendant intentionally stripped the victim's clothing and then forced his hand and/or another object into the victim's most intimate parts. These are not actions routinely taken by men who do not get some sort of strange sexual gratification from treating a woman in this manner. *Montana v. Olsen*, 951 P.2d at 578. A rational jury could infer that the Defendant's actions went beyond those constituting an assault because the Defendant committed the acts in a sexual manner, and for his sexual arousal or gratification. The touching resulted in pain, injury, and the victim having to undergo a sexual assault examination. The jury in this case was properly instructed, and they concluded the evidence supported each of the elements of sexual battery. We will not disturb the jury's findings on appeal. The Defendant is not entitled to relief on this issue.

### B. Double Jeopardy

The Defendant next contends that his convictions violate protections against double jeopardy. He argues that the trial court should have merged the two sexual battery convictions. He further asserts that his convictions for sexual battery and aggravated assault violate double jeopardy protections.

### 1. Merger of Sexual Battery Convictions

The double jeopardy clause of the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. Similarly, under our Tennessee Constitution, "no person shall, for the same offense, be twice put in jeopardy of life or limb." TENN. CONST. art. 1, § 10. "[W]hether two offenses are the 'same' for double jeopardy purposes depends upon a 'close and careful analysis of the offenses involved, the statutory definitions of the crimes, the legislative intent and the particular facts and circumstances.'" *State v. Denton*, 938 S.W.2d 373, 378 (Tenn. 1996)(quoting *State v. Black*, 524 S.W.2d 913, 919 (Tenn. 1975).

"Multiplicity concerns the division of conduct into discrete offenses, creating several offenses out of a single offense." *State v. Phillips*, 924 S.W.2d 662, 665 (Tenn. 1996). In determining whether two or more unlawful sexual acts may be the subject of separate conviction, our Supreme Court has suggested consideration of the following factors:

1. Temporal proximity-the greater the interval between the acts, the more likely the acts are separate;

2. Spatial proximity-movement or repositioning tends to suggest separate acts;

3. Occurrence of an intervening event-an-interruption tends to suggest separate acts;

4. Sequence of the acts-serial penetration of different orifices as distinguished from repeated penetrations of the same orifice tend to suggest separate offenses; and

5. The defendant's intent as evidence by conduct and statements.

*State v. Barney*, 986 S.W.2d 545, 548-49 (Tenn. 1999).

At the conclusion of the proof, the State informed the trial court that it sought two separate aggravated rape convictions, one based upon the Defendant's insertion of his finger into the victim's vagina and the other for his insertion of his hand or an object into her rectum. At trial, the victim testified that the Defendant took his finger, "rammed it in [her] vagina and said it was sticky." The Defendant then began choking the victim until the victim went down onto the floor. After this, the Defendant then began running through the house saying "the nigga must be still in the house" while the victim remained on the floor because she was numb from being choked. The Defendant returned, snatched her legs apart, and rammed something into her rectum. Considering the aforementioned factors, the time between the two acts, the fact that they involved the penetration of different orifices, and the Defendant's absence to search for a man in the house between the two instances, we conclude that the trial court did not err when it declined to merge these two convictions. The Defendant is not entitled to relief on this issue.

## 2. Merger of Sexual Battery and Aggravated Assault Convictions

The Defendant next contends that the trial court erred when it failed to merge his conviction for sexual battery into his conviction for aggravated assault. He concedes our review is limited to plain error review. He asserts, however, he is entitled to plain error relief because his convictions violate double jeopardy in that they were committed in one continuous act.

In Tennessee, "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion

for a new trial; otherwise such issues will be treated as waived . . . ." Tenn. R. App. P. 3(e); *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010); *State v. Keel*, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994).  This Court may, however, review an issue which would ordinarily be considered waived if the Court finds plain error in the record.  *See* Tenn. R. App. P. 36(b).  The doctrine of plain error provides that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."  Tenn. R. App. P. 36(b).

This Court will grant plain error review only when: "(1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake; that is, the error was so significant that it 'probably changed the outcome of the trial.'"  *Hatcher*, 310 S.W.3d at 808 (citing *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994)).  "If any of these five criteria are not met, we will not grant relief, and complete consideration of all five factors is not necessary when it is clear from the record that at least one of the factors cannot be established."  *Id.* (citation omitted).  We need not consider all five factors when the record clearly establishes that at least one of the factors is not met.  *Hatcher*, 310 S.W.3d at 808.  It is the defendant's burden to persuade this Court that plain error exists and that the error "was of sufficient magnitude that it probably changed the outcome of the trial."  *State v. Hester*, 324 S.W.3d 788, 808 (Tenn. 2010).

Because each element of our plain error review must be met, we turn first to address whether a clear and unequivocal rule of law was breached.  The Defendant notes that the Tennessee Supreme Court recently adopted a new standard for evaluating whether multiple convictions violate double jeopardy protections.  *See State v. Watkins*, 362 S.W.3d 530, 556 (Tenn. 2012) (adopting the standard announced in *Blockburger v. U.S.*, 284 U.S. 299, 304 (1932)).  The Defendant contends this standard is "stricter" that the one previously employed in Tennessee pursuant to *State v. Denton*, 938 S.W.2d 373, 378 (Tenn. 1996).  He asserts, therefore, that the standard announced in *Watkins* should not be applied retroactively when analyzing his convictions.

We cannot agree with the argument posited by the Defendant.  In general, new rules of constitutional law are given retroactive effect.  *See Van Tran v. State*, 66 S.W.3d 790, 810-11 (Tenn. 2001) ("'a new state constitutional rule is to be retroactively applied to a claim for post-conviction relief if the new rule materially enhances the integrity and reliability of the fact finding process of the trial.') (quoting *Meadows v. State*, 849 S.W.2d 748, 755 (Tenn. 1993) and citing T.C.A. § 40-30-222 (1997)).  *Watkins* did not create a "new state

constitutional rule." *David Keen v. State*, __ S.W.3d __, 2012 WL 6631245, at *3 (Tenn. Dec. 20, 2012). *Watkins* also did not change the analysis for determining when due process violation occurs; rather, *Watkins* clarified the test to be employed, aligning our state standard with the federal standard. Accordingly, we hold that we should use the clarified standard articulated in *Watkins* to determine whether the Defendant's convictions violate due process protections. As further support for our holding, we note that the Tennessee Supreme Court in *State v. Cross*, 362 S.W.2d 512, 519 (Tenn. 2012), retroactively applied the *Watkins* test when determining whether a defendant's multiple convictions violated double jeopardy protections.

We, therefore, turn to address whether the Defendant's convictions in this case violate double jeopardy protections pursuant to the *Blockburger* test, as adopted by our highest court in *Watkins*. The Double Jeopardy Clause of the Fifth Amendment provides that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. Similarly, the Tennessee Constitution provides that "no person shall, for the same offence, be twice put in jeopardy of life or limb." TENN. CONST. art. 1, § 10. Our Supreme Court has recognized the Double Jeopardy Clause to provide three fundamental protections: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." *Watkins*, 362 S.W.3d at 541 (Tenn. 2012); *see also State v. Pickett*, 211 S.W.3d 696, 705 (Tenn. 2007). This case concerns the last of these three categories.

The *Blockburger* test, as adopted in *Watkins*, addresses whether multiple convictions result in multiple punishments for the same offense. Pursuant to the *Blockburger* test, the threshold inquiry is whether the defendant's convictions arose from the same act or transgression. *Watkins*, 362 S.W.3d at 545. If the convictions do not arise from the same act or transgression, the state and federal prohibitions against double jeopardy are not implicated, and the inquiry ends. *Id.*

If, however, the convictions arose from the same act or transgression, the court must then determine whether the legislature intended to allow the offenses to be punished separately. *Id.* at 556. When the legislature has not clearly expressed its intent either to prevent or to preclude the dual convictions, the court must examine the statutes to determine whether the crimes constitute the same offense. *Id.* at 557. "The court makes this determination by examining statutory elements of the offenses in the abstract, rather than the particular facts of the case." *Cross*, 362 S.W.3d at 520. "[I]f each offense includes an element that the other does not, the statutes do not define the 'same offense' for double jeopardy purposes," and courts "will presume that the Legislature intended to permit multiple punishments." *Watkins*, 362 S.W.3d at 557.

-18-

As required by *State v. Watkins*, we have examined the charging instrument and the relevant statutes, and we have considered whether the charges arise from discrete acts or involve multiple victims. *See Watkins*, 362 S.W.3d at 556-57. The record provides two bases for concluding that the Defendant's double jeopardy claim survives threshold scrutiny. First, the Defendant's convictions arise from the same continuous act—his beating of the victim after he believed he caught her with another man. Second, there was one victim in this case. Therefore, because his convictions arise from a single act and do not involve multiple victims, the Defendant's double jeopardy claim survives our threshold inquiry.

The offenses relevant to the double jeopardy analysis in this case are Class C felony aggravated assault and Class E felony sexual battery. According to our statutes, "(a)(1) A person commits aggravated assault who: (A) Intentionally or knowingly commits an assault as defined in § 39-13-101 and: (i) Causes serious bodily injury to another; (ii) Uses or displays a deadly weapon; or (iii) Attempts or intends to cause bodily injury to another by strangulation . . . ." T.C.A. § 39-13-102(a)(1)(A) (2010). According to Tennessee Code Annotated section 39-13-101, a person commits assault who:

> (1) Intentionally, knowingly or recklessly causes bodily injury to another;
>
> (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or
>
> (3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.

T.C.A. § 39-13-101(a)(1)-(3) (2010). "Sexual battery" is defined as, "(a) . . . unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: (1) Force or coercion is used to accomplish the act; . . . ." T.C.A. § 39-13-505(a)(1) (2010).

The statutory elements of aggravated assault include that the Defendant either use a deadly weapon or that he inflict serious bodily injury. In this case, the evidence proved that, during the altercation, the Defendant obtained and used a knife during his attack on the victim. Sexual battery requires that the Defendant have unlawful sexual contact with the victim through the use of force. The evidence in this case proved that the Defendant choked the victim until she submitted to him and then he inserted his finger or other object in her vagina and then subsequently in her rectum. We conclude that the statutory elements of these offenses, as charged in this case, do not constitute the same offense and one is not a lesser included offense of the other for purpose of the *Blockburger* test, which was adopted by

*Watkins*. *See State v. Reed*, 689 S.W.2d 190, 193-94 (Tenn. Crim. App. 1984) (holding that the offense of aggravated assault may or may not be a lesser included offense of aggravated rape, depending upon the allegations in the indictment and the proof) (citing *Howard v. State*, 578 S.W.2d 83 (Tenn. 1979)); *see also State v. Tina Swindle*, No. 01C01-9805-CR-00202, 1999 WL 254408, at *3 (Tenn. Crim. App., at Nashville, Apr. 30, 1999), *no. Tenn. R. App. P. 11 application filed* (concluding that assault was not a lesser included offense of the offense of aggravated sexual battery in light of the facts presented in that case). The Defendant is not entitled to relief on this issue.

## C. Sentencing

The Defendant next contends that the trial court erred when it sentenced him. The Defendant asserts that the trial court improperly applied enhancement factor (5), that the Defendant treated the victim with exceptional cruelty, to his convictions. *See* T.C.A. § 40-35-114 (5) (2010). He also asserts that the trial court improperly applied enhancement factor (9), that the Defendant possessed or employed a deadly weapon during the commission of this offense, to his Count 2 sexual battery conviction. *See* T.C.A. § 40-35-114 (9) (2010). The Defendant finally contends that the trial court erred when it failed to apply two mitigating factors to his convictions, mitigating factor (2) that the Defendant acted under strong provocation and (9) that the Defendant had diminished capacity. *See* T.C.A. § 40-35-113 (2), (9) (2010). The Defendant does not appeal the trial court's imposition of consecutive sentences. The State counters that the evidence supports the trial court's application of two enhancement factors and its rejection of two mitigating factors.

At the sentencing hearing, the State recounted the facts of the case. The State then offered the pre-sentence report and informed the trial court that it believed that the Defendant, based on his record, was a Range III, persistent offender for purposes of sentencing him for the aggravated assault conviction and that he was a Range IV, career offender for purposes of sentencing him for his two sexual battery convictions. The State noted that the Defendant's record was "repleat with multiple arrest[s] and convictions" and that, when he testified at trial, he admitted to being a drug dealer.

The trial court noted that the Defendant's record indicated that he had at least five prior felony convictions.[3] The trial court then sentenced the Defendant, articulating the applicable law and stating that he had made the appropriate considerations under that law. The trial court then stated:

---

[3] There were two other possible felony convictions discussed by the parties, and the trial court asked to see the "jackets" for those convictions.

In the presence report I find that the [D]efendant has five prior felony convictions.

. . . .

Based upon those five prior felony convictions the Court finds that [the Defendant] qualifies as a Range 3 Persistent Offender for purposes of counts One, Two and Three. According to the record he has multiple other convictions. Nine convictions for driving on a revoked license[]. One conviction for domestic violence. Four convictions for simple possession. A driving – another driving while licenses revoked. A reckless driving. Two simple assaults. A trespassing. A disorderly conduct.

So pursuant to the record, again, the Court finds that [the Defendant] has an extensive criminal background and criminal history.

. . . .

With regard to Count One of the indictment the Court finds that [the Defendant] is a Range Three Persistent Offender.

The enhancement factors are found in 40-35-114. They state that the [D]efendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range.

As the Court has set out, he has multiple prior convictions. There also was testimony from the [D]efendant that he is engaged in and continues to be engaged in or did up till [sic] the time of his incarceration the sale of drugs in that particular neighborhood.

Further, that the [D]efendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense. There was ample testimony as to the [D]efendant's actions toward the victim in this case.

And this will apply in both Counts One . . . Count Two and in Count Three. There was testimony of the different actions by the [D]efendant. Specifically there was testimony of his digitally penetrating the victim vaginally and the language and the gestures that he used. And as he put it, testing her to see if she'd had sex with somebody else. The fact that he cut her with a knife. The fact that he poked her and/or stabbed her to some extent

-21-

with a screwdriver. That he hit her over the head with a flower vase. That he cut off her hair. That he told her he was fixing to burn her up and poured a fluid on her body. You know, she not knowing what that was. All of those things the Court finds is exceptionally cruelty during the commission of the sexual battery by digitally vaginally penetrating the victim and I will take those into account.

I don't find that there are any . . . mitigating factors which are found in 40-35-114 . . . . For that reason the Court is of the opinion that [the Defendant's] sentence for this [sexual battery] offense should be six years as a Range Three Persistent Offender.

Count Two of the indictment involves sexual battery by anal penetration. Again, the Court finds that [the Defendant] is a Range Three Persistent Offender based upon his prior convictions. He does have prior additional criminal convictions and criminal behavior. I've already set out of the criminal convictions and also the fact that he testified that he is, was actively involved in the drug trade business in that community. So the Court is going to put a great deal of emphasis in all of these cases on his criminal history and his criminal behavior.

Again, the Court finds that he treated the victim with exceptional cruelty during the commission of this offense.

[W]ith regard to the sexual battery conviction by the jury, the Court finds that there was extensive I think the testimony was digital penetration. But there was additional injuries and damage to the victim as a result of the anal penetration.

Again, the court finds that the cutting her with a knife, stabbing her with a screwdriver, hitting her over the head with a vase and cutting off her hair and then advising her that he was about to burn her up, those are additional means by which the defendant treated the victim with exceptional cruelty during the commission of this offense. And I am going to take those into account in imposing [his] sentence[,] as well as his extensive record.

[The] Court finds that Number 9 is applicable in this case. The [D]efendant possessed or used a deadly weapon during the commission of the offense. There is testimony that a knife was used. She was cut. She was prodded. She was poked. And at least to some extent stabbed in the ear by a

screwdriver. The knife, the knife blade that was not recovered but the handle was recovered and she did have some injuries consistent with being cut. So the Court will find that the [D]efendant used a deadly weapon during the commission of this offense.

[The] Court finds that there are no mitigating factors . . . in this particular case. And the court will further find that the proper sentence in this case taking those issues, those enhancement factors into account will be six years as a Range Three Persistent Offender.

To the offense of aggravated assault in Count Three, the Court finds that [the Defendant ] is a Range Three Persistent Offender.

The Court finds that he has a previous history of criminal convictions and/or criminal behavior in addition to those necessary to establish his range. The Court has previously set those convictions and criminal behavior out. The Court feels, again for the same reasons, that the [D]efendant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense.

Although many of these factors are part of the aggravated assault, the cutting, the stabbing with [the] screwdriver, the cutting with a knife, the smashing the vase on her head, those are things which would be part of, in the Court's opinion, the aggravated assault. But the [D]efendant went on to threaten the victim extensively with burning and poured water on her, she didn't know it was water but she felt that it was some type of igniting fluid. He cut her hair. The multiple different weapons that he used to beat her, in this Court's opinion, would justify exceptional cruelty during the commission of this offense.

Further, that the manner and means by which he digitally penetrated her, the force and violence that was used in that digital penetration, those are not elements of the aggravated assault. And the Court would find that, again, those are . . . treating this victim with exceptional cruelty and those are applicable enhancement factors for the crime of aggravated assault.

The Court finds that there are no mitigating . . . factors found in 40-35-114. And, therefore, the Court would impose a sentence of fifteen years as a Range Three Persistent Offender for the offense of aggravated assault.

The trial court went on to order that the Defendant's sentences run consecutively to each other for a total effective sentence of twenty-seven years. On appeal, the Defendant contends that the trial court improperly applied two enhancement factors and improperly failed to apply two mitigating factors.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2010); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). In 2005, the Tennessee General Assembly amended the sentencing law in order to bring Tennessee's sentencing scheme into compliance with United States Supreme Court rulings on the subject. *See United States v. Booker*, 543 U.S. 220 (2005); *Blakely v. Washington*, 542 U.S. 296 (2004).

Before the 2005 amendments to the Sentencing Act, both the State and a defendant could appeal the manner in which a trial court weighed enhancement and mitigating factors applied to the defendant's sentence. T.C.A. § 40-35-401(b)(2) (2004). The 2005 amendments, however, deleted, as grounds for appeal, a claim that the trial court did not properly weigh the enhancement and mitigating factors. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 8, 9. As a result, the appellate courts were "left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." *Carter*, 254 S.W.3d at 345-46.

Appellate review of sentences has been *de novo* with a presumption of correctness. *See* T.C.A. § 40-35-401(d) (2010). In a recent decision, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* at 708; *State v. Christine Caudle*, __ S.W.3d __, No. M2010-01172-SC-R11-CD, 2012 WL 5907374, at *5 (Tenn. Nov. 27, 2012) (explicitly applying the same standard to questions related to probation or any other alternative sentence).

A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980).

The "presumption of reasonableness" applied to sentences imposed by trial courts "'reflects the fact that, by the time an appeals court is considering a within-Guidelines sentence on review, *both* the sentencing judge and the Sentencing Commission will have reached the *same* conclusion as to the proper sentence in the particular case.'" *Susan Renee Bise*, 380 S.W.3d at 703 (quoting *Rita v. United States*, 551 U.S. 338, 341 (2007)). A presumption of reasonableness "simply recognizes the real-world circumstance that when the judge's discretionary decision accords with the [Sentencing] Commission's view of the appropriate application of [sentencing purposes] in the mine run of cases, it is probable that the sentence is reasonable." *Rita*, 551 U.S. at 350-51.

In conducting its review, this Court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. §§ 40-35-102, -103, -210 (2010); *see also Bise*, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. *See* T.C.A. § 40-35-401 (2010), Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c) (2010).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. *See* T.C.A. § 40-35-114 (2010); *see also Bise*, 380 S.W.3d 699 n.33, 704; *Carter*, 254 S.W.3d at 343. We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any

sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W3d at 706. "[Appellate Courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

In the case under submission, the trial court found that enhancement factor (1) applied, and the court gave that enhancement factor great weight. *See* T.C.A. § 40-35-114(1) (2010) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"). It found enhancement factor (5) applied after considering the nature and extent of the victim's wounds, the Defendant's telling the victim she was going to die during the attack, and his pouring a liquid on her while threatening that he was going to burn her. *See* T.C.A. § 40-35-114(5) (2010) ("The defendant treated, or allowed to be treated, with exceptional cruelty during the commission of the offense"). The trial court found enhancement factor (9) applied because the Defendant used a knife, a deadly weapon, and also stabbed the victim in the ear with a screwdriver, which also can be a deadly weapon. *See* T.C.A. § 40-35-114(9) (2010) ("The defendant possessed or employed a . . . deadly weapon during the commission of the offense").

In sentencing the Defendant to twenty-seven years' confinement, the trial court noted the violent penetration of the victim's vagina and rectum, her resulting injuries, that she was stabbed in the ear with a screwdriver, and that she was repeatedly poked and cut with a knife. The trial court noted that this abuse was beyond what was inherent in the offense.

With regard to the Defendant's argument that the trial court improperly applied two enhancement factors and failed to apply two mitigating factors, we conclude that the evidence supports the trial court's determinations. The trial court followed the statutory sentencing procedure, made factual findings supported by the record, and considered the principles relevant to sentencing. The trial court also stated that it had considered the trial evidence in reaching its sentencing determination. The Defendant does not contest the trial court's application of enhancement factor (1), a factor weighed heavily by the trial court, and this factor alone is a sufficient basis upon which to affirm his sentence.

Further, the evidence supports the trial court's finding that the Defendant used a knife, a deadly weapon, and also stabbed the victim in the ear with a screwdriver, which also can be a deadly weapon. This finding supports the trial court's application of enhancement factor

(9). *See* T.C.A. § 40-35-114(9) ("The defendant possessed or employed a . . . deadly weapon during the commission of the offense"). Finally, we conclude the trial court did not err when it applied enhancement factor (5), that the defendant treated the victim, or allowed the victim to be treated, with exceptional cruelty during the commission of the offense. As the trial court noted, the nature of these offenses were exceptionally cruel in that the victim suffered pain and injury to her genitalia, numerous wounds all over her body, and the mental fear that she was going to die during the attack, when the Defendant poured a liquid on her and threatened to burn her. *See* T.C.A. § 40-35-114(5) (2010). The trial court heard the victim and the Defendant testify and determined that the Defendant's actions toward the victim were exceptionally cruel. The trial court did not err in this regard. As the enhancement factors applied by the trial court are supported by the evidence, we conclude the trial court properly sentenced the Defendant. He is not entitled to relief on this issue.

### III. Conclusion

Based upon the foregoing authorities and reasoning, we conclude there exists sufficient evidence to support the Defendant's convictions and that the trial court did not err when it failed to merge those convictions. We further conclude that the trial court did not err when sentencing the Defendant. As such, the trial court's judgments are affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE